## STINSON v. ALUMINUM CO. OF AMERICA.

No. 9435.

Circuit Court of Appeals, Sixth Circuit.

April 3, 1944.

Clyde W. Key, of Knoxville, Tenn. (Pope & Pope and Kennerly & Key all of Knoxville, Tenn., on the brief), for appellant.

Homer A. Goddard, of Maryville, Tenn., and R. R. Kramer, of Knoxville, Tenn. (Poore, Kramer & Overton all of Knoxville, Tenn., and Goddard & Gamble all of Maryville, Tenn., on the brief), for appellee.

Before SIMONS, MARTIN, and Mc-ALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

In a negligence suit, in which appellant administratrix claimed damages for the death of her husband, A. Blaine Stinson, the district court directed a verdict in favor of the appellee, on the ground that appellant failed in her proof of negligence.

The facts are as follows: Appellant's decedent was a brakeman in the employ of the Louisville & Nashville Railway Company and, at the time of the accident in question, was working in the privately owned switch yards of appellee, Aluminum Company of America, adjacent to its plant at Alcoa, Tennessee. The yard had switching connections with the Southern Railway Company and the Louisville & Nashville Railway Company. In the yard were 9 parallel tracks, which were referred to as the L. & N. track, the Southern track, and so on. On the afternoon of September 15, 1941, appellant's decedent left a locomotive on one track, the Southern, and went over to another track, the L. & N., to couple air hose to the cars standing thereon. His duties required him to return to the locomotive after completing the task of coupling the cars.

Between the Southern track and the L. & N. track were two other tracks, known as the scale track and the Long John track. Therefore, in returning to the locomotive on the Southern track, after coupling cars on the L. & N. track, Stinson

would have to recross these two tracks. A flagman, Hodge, saw Stinson coupling cars on the L. & N. track, and thereafter saw him disappear behind a string of cars standing on the scale track. On his way back to the Southern track, Stinson would have been obliged to cross, first the scale track, and then, the Long John track, to return to his original place of duty. It was on the Long John track, on which appellee was operating its switching engine, that the accident occurred. What then happened is not known. But Hodge testified that after having seen Stinson disappear behind the line of cars on the scale track, he next saw him "stumbling" on the front end of the moving engine in question. Hodge said that he gave the engineer on the switch engine the "washout signal" —an emergency signal, meaning to stop immediately—and that, thereafter, the engine continued on for a distance of about 15 feet, when Stinson fell to the track and was killed when the engine passed over him. The engineer testified that he did not see any signal until after the accident occurred.

No one knows how Stinson got on the front end of the locomotive. Appellant assumes or supposes that he was struck and clambered onto the step, grabbing for something to hold in order to avoid falling beneath the wheels. Appellee's theory is that Stinson attempted to catch a ride and, after getting on the step, was unable to secure a hold on the engine and slipped off. Whatever actually happened that resulted in Stinson's being on the front of the engine, and stumbling and falling, is of minor importance here, in view of the controlling issues in the case.

Appellant contends that the engineer was negligent in not observing the washout signal and that Stinson's life would have been saved if the engineer had stopped when Hodge gave such signal. The question of the engineer's negligence in failing to observe the signal, it is insisted, should have been submitted to the jury. Furthermore, it is claimed that the trial court erred in refusing to permit the introduction of testimony affecting the credibility of the engineer.

Hodge, the flagman, was working with his train on the Southern track. He testified that when he first saw Stinson stumbling on the front of the Diesel engine, he gave the washout signal. Hodge was then at the side of the Southern track. The Diesel engine was about 300 feet away, and on a different track to the north of the one at which Hodge was working. After Hodge gave the washout signal, the Diesel engine traveled about 15 feet when Stinson fell beneath the wheels. The engine continued to move on and traveled approximately 300 feet from the time when the signal was first given, until it was stopped.

Cameron, the engineer, testified that he saw Hodge giving the washout signal a second or two before Hodge hollered at him, telling him that he had run over a man. This was some time after the accident. On cross-examination, Cameron was asked whether he had told Hodge, after the accident, that he had seen the signal and did not obey it because he didn't know Hodge was signaling to him, and thought he was signaling to the Southern crew. To this question, Cameron replied: "Not me"; and added that he didn't remember telling Hodge anything on the day of accident. Hodge was then asked whether Cameron had stated to him "that for *some distance* down there he saw you signaling him about it, cutting up, and that the reason he didn't obey it, he said he thought you were signaling to the Southern crew." Hodge replied that he could not answer the question in the way it was put. "It is that 'some distance' is what I didn't want to answer to." "I asked him why he didn't stop if he saw me, and he says, 'I saw you, but I thought you were giving a signal to your crew.'" Cameron said nothing to Hodge to indicate when he had first seen Hodge's signal. On his direct examination, Cameron said that he did not see the signal until a second or two before Hodge had hollered to him.

It is contended by appellant that there is a contradiction between what Cameron testified to, and what Hodge stated he said after the accident. The most that could be said of the foregoing is that, while Cameron stated he did not remember having told Hodge that he saw him and did not stop because he thought the signal was for another crew, Hodge testified that he did make such a statement. But this statement would not be evidence of any admission of negligence. Cameron's failure to stop, after he had seen the signal, would be negligence causing the damage herein claimed, only if he had seen, and failed to comply with, the signal, before Stinson was run over. There is no proof in the case, direct or indirect,

by admissions or inferences, that Cameron saw the signal before the accident. Hodge was careful to point out that Cameron did not say that he had seen Hodge signaling "for some distance down there"—but rather, that Cameron had seen him and thought he was giving the signal to his crew.

On his direct examination, Hodge, after testifying that he first gave the washout signal when the Diesel engine was 300 feet away, stated that when he gave the signal, Cameron was looking at his own track and not at Hodge,—and that after he gave the signal, it appeared that Cameron was looking right at him, but that he didn't know whether he saw him. After the accident, while the engine was still proceeding down the track, Hodge was still trying to head it off and stop it. It is fair to conclude from the testimony, that Hodge was signaling Cameron to stop from the first time he saw Stinson struggling on the engine; and Hodge says that it was 30 seconds from the time he first saw the engine coming, until he hollered at Cameron and the engine stopped. There is no evidence as to when, during this time, Cameron first saw these repeated signals, except his own statement that it was a second or two before Hodge called to him; and it was then too late to avoid the accident.

In the foregoing, there is nothing in Hodge's testimony to dispute Cameron on the important point of when Cameron first saw the signal; and Hodge did not testify that Cameron said anything after the accident that contradicted what Cameron testified to on the trial, as to when he first saw the signal. Hodge first gave his signal when Cameron was 300 feet away. If Cameron did not see the signal until he had traveled 200 feet beyond the point where Stinson fell beneath the wheels, it is unimportant that he then continued on, thinking that Hodge was signaling to the Southern crew—until Hodge hollered at him and told him he had run over a man.

■ Everything that Hodge testified to, as to what Cameron told him after the accident, is consistent with Cameron's testimony that he did not see the signal until a second or two before Hodge called out to him; and, at that time, Stinson had been run over, a couple of hundred feet up the track.

The argument that appellant seems to make out of Hodge's testimony is that Cameron admitted he had seen the signal, —and that, if he had complied with it, he would have stopped the engine and saved Stinson's life. But there is no evidence in the case, that Cameron saw the signal until long after Stinson had been run over; and, as Hodge testified, Cameron never said anything to him to indicate when he had first seen the signal. The only evidence on this point is the testimony of Cameron, who insisted that he did not see the signal until just before he stopped, a considerable distance from the point of the accident. Proof of the asserted admissions, and the proffered proof in impeachment, did not evidence negligence, or admission of negligence, on the part of Cameron.

■ On the question as to error in the court's exclusion of evidence that went to Cameron's credibility, it appears that Cameron was asked, as laying the foundation for impeachment, whether "at that instant and just a few minutes after Stinson was killed Mr. Hughes didn't say to you in substance he didn't say, why you had to drag that man so far and why you didn't stop, and you said, 'I saw Hodge down there cutting up, but I thought he was signaling to the Southern crew.'" Cameron answered that he didn't remember anything about such talk or even having seen Hughes. Hughes was a conductor on an L. & N. train, and upon questions being asked of him, with the object of contradicting Cameron, the witness stated that he was not talking directly to Cameron "when I said what I did." He continued: "I said it looked like they could have stopped that before they dragged the man as far as they did. And he spoke up—" Here, the court interrupted to ask whether the conversation was based on what Hughes had heard about the accident, and whether there was anything in Cameron's statement that indicated the period of time that had elapsed before Cameron had seen the signal prior to the accident. The witness replied that the conversation with Cameron was based upon what he had heard and that there was nothing in Cameron's statement to indicate he had seen the signals before the accident. After further colloquy, in which the court remarked that the answers of Hughes, to the questions asked, would not contradict Cameron, the jury was temporarily excused, and the court stated that counsel could place in the record what they pleased in order to raise their question. In answer to an interrogation, Hughes then testified: "I just

said what I did about not stopping it, dragging the body so far, and Mr. Cameron spoke up and said, 'I saw Hodge up on that car cutting up, giving the signal you know,' and he thought he was giving the signal to his engineer, Southern engineer." This evidence was inadmissible to impeach Cameron. While the latter did not deny that he had made such a statement, still, even if he had said what was claimed, it would not have contradicted his testimony that he saw Hodge signaling only a few seconds before he called to him; and it would not have indicated that Cameron saw the signal at any time before the accident. What has already been said with reference to the testimony of Hodge, in this regard, is applicable to that of Hughes.

■ The questions asked Cameron, Hodge, and Hughes, and their answers, illustrate the confusion that may result when the foundation for impeachment is not laid according to the usual requirement, by asking the witness to be impeached whether he made a specific statement to a certain person at a certain time and place, and then, upon his denial, proving that he did make that statement to the person in question, at the time and place specified. In the case of the alleged impeachment of Cameron by Hughes, Cameron was asked whether "right at that instant and just a few minutes after Stinson was killed," Hughes had not said something to him, and he had responded in a certain way. On Cameron's failure to remember anything about such a talk, Hughes, in answer to a question seeking to impeach Cameron, stated that he was not talking directly to Cameron at the time Cameron made a statement, similar to that embraced in the impeaching question, but that Cameron "spoke up"; and that this incident occurred, not immediately after Stinson was killed, but a half hour afterward, when the ambulance had departed and Stinson had been taken to the hospital. Hughes had not been at the scene of the accident, and did not find out about it until after he had left the yards and had been down to the main plant of appellee. The question, therefore, asked Cameron, for the purpose of laying the foundation for his impeachment, specified a different time from that disclosed in the answer of the so-called impeaching witness; and it further appeared that Hughes had not said anything to Cameron in the nature of a question or in carrying on a conversation,

for, as he testified, he was not talking directly to him when he made the remark. Under the circumstances, because of the harrowing situation, the number of persons who probably had appeared at the scene of the accident during the course of a half hour subsequent thereto, and the various remarks that are usually made at such a time, the virtue of an adherence to the usual rule governing the foundation for impeachment, can be well appreciated. The testimony of a witness is not to be disregarded on the ground that he has given false testimony as to his statements out of court, unless such specific statements are called to his attention and he is questioned thereon with the required particularity. However, in no event, did the procedure followed in this case, result in disadvantage to either party, inasmuch as the testimony of the witnesses in question did not contradict Cameron.

■ Under the "Humanitarian Doctrine" prevailing in Tennessee, appellant claims the case should have been submitted to the jury. According to this doctrine, a party causing injury to another, is liable in spite of the latter's contributory negligence, where the first party, either discovered and appreciated the danger to the other, before the accident, or, by the exercise of ordinary care, could have discovered such exposure to peril in time to avoid the injury. See Todd v. Cincinnati, etc., R. Co., 135 Tenn. 92, 185 S.W. 62, L.R.A. 1916E, 555.

The foregoing contention presents the question whether the engineer should have seen Stinson before the latter was being carried on the front of the engine, and, also, whether he should have seen the "washout" signal and stopped before the accident. A brief observation with regard to the engine and its operation, will clarify the first of these points.

The Diesel engine had two footboards projecting from its front end—one on the right, and the other on the left side. Each footboard was about 4 feet in length, across the front of the engine, and about a foot wide. They were affixed to the engine at a height of approximately 15 inches above the crossties of the track. The engineer operated in the left rear part of the engine. He could see down the track, but because of the structure, could not see anyone approaching from the right, unless such person were approximately 15 feet in front of the engine.

It is, therefore, obvious that Stinson, coming from the line of box cars at the engineer's right, could have approached some distance ahead of the oncoming engine without having been observed by the engineer; and he could have swung onto the engine, or jumped onto the right-hand step, without having been perceived by the operator. Standing here, Stinson would not have been seen from the position of the engineer; and it was on this right-hand step, that Hodge first saw him, standing in a crouching position. "He was on the footboard. He would have been safe if he could have stayed on the footboard; * * * he was trying to get hold of something and to hold on there." At this time Stinson, in trying to get a hold, was facing the engine. The engineer testified that he was proceeding at a speed of 15 to 20 miles an hour. Hodge testified that, in his opinion, the speed was 3 to 6 miles per hour.

▮ Whatever the speed, it would be most remarkable that Stinson, had been struck by the engine, either while walking toward it, or walking away from it, or crossing the track—with the result that he was found standing on the step, 15 inches above the ties, facing the engine, in a place of safety, if he could have found a hand hold. It seems more probable that Stinson swung onto the engine to get a ride back to his place of duty, and lost his hold. But this we are not called upon to decide. Enough of the evidence has been recited to sustain the conclusion that there was no proof therein of negligence on the part of appellee. While appellant also charged negligence for failure to keep a lookout and to sound a warning to Stinson, of the approach of the engine, an examination of the record discloses no evidence to support such claim.

▮ We cannot say that the engineer's failure to see the washout signal was evidence of negligence. If there had been proof that he had seen the signal, but had not heeded it because he did not know, precisely, the nature of the danger warned against, a different question would be before us. But the engineer was 300 feet away from the point where the signal was given, by a flagman who was working on a train on a different track. From the time the signal was first given, it was only a couple of seconds before Stinson fell beneath the engine. Under these circumstances, it cannot be said that the engineer

was bound, in the exercise of due care, to see such a signal before the accident. The evidence did not justify submitting the question of appellee's negligence to the jury.

The judgment of the district court is affirmed.